**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

MILTON NEAL,

               Plaintiff,

               v.

JOHN POWELL, et al.,

               Defendants.

Civil Action No. 17-4768 (KMW) (MJS)

**OPINION**

**WILLIAMS**, District Judge:

This matter comes before the Court on Defendants' Motions seeking Summary Judgment in this prisoner civil rights matter.  (ECF No. 58.)  Plaintiff filed a response to the motion (ECF No. 60), to which Defendants replied.  (ECF No. 66.)  Following notice that the Court intended to make factual determinations as to the exhaustion issues raised in the motion, the parties submitted supplemental briefing.  (ECF Nos. 75-76.)  This Court also held an evidentiary hearing on the motion on February 24 and March 7, 2023.  (*See* ECF Nos. 93-94) For the following reasons, Defendants motions shall be granted in part and denied in part.

## I.    BACKGROUND

The events at issue in this matter arose out of a brief interaction between Plaintiff and a pair of corrections officers in August 2015 while Plaintiff was a prisoner in Bayside State Prison.  (*See* ECF No. 58-6 at 5.)  On the morning of August 14, 2015, Plaintiff was confined to a satellite camp facility of the prison, known as Spruce 2.  (ECF No. 58-9 at 51-52.)  That afternoon, while

filling a bottle of water at a water fountain, Plaintiff spotted Defendants Woolson and Tracey, who he believed were plotting to attack him. (*Id.* at 54.) The officers, by contrast, attested that they had no interaction with Plaintiff prior to the incident in question. (*Id.* at 4, 11.) According to the officers, while ten feet away, Plaintiff threw the bottle at Defendant Woolson, striking him in the chest. (*Id.*) Plaintiff denies throwing the bottle, but does state that he dropped it. (*Id.* at 55.) Photographs taken after the incident do appear to show water stains consistent with being struck with a water bottle on Woolson's uniform. (ECF No. 58-7 at 16.)

According to the officers, after the bottle struck Woolson, Woolson called for backup and sprayed Plaintiff in the face with mace. (ECF No. 58-9. at 4, 11.) Plaintiff then tried to run up a flight of stairs to wash out his eyes. (*Id.* at 55.) According to Defendant Woolson, Plaintiff stumbled on the stairs and struck his face, while Plaintiff maintains he did not hurt himself on the stairs. (*Id.* at 4-5, 55.) Once at the top of the stairs, Plaintiff attempted to wash out his eyes while Defendants Woolson and Tracey ordered him to get down and be handcuffed. (*Id.*) Plaintiff testified at his deposition that the officers then struck him in the face with something like a large metal flashlight, damaging his teeth. (*Id.* at 55.) Defendants instead contend that Plaintiff was not punched or struck with an object, but was tackled to the ground and restrained because he resisted their attempts to take him into custody. (*Id* at 4-5, 11-12.)

As a result of this incident, Plaintiff was placed into disciplinary detention and charged with disciplinary infractions related to his alleged assault on Defendant Woolson. (*See* ECF No. 58-7 at 1-6.) Following a disciplinary hearing, Plaintiff was found guilty of these infractions and sanctioned with penalties including detention in administrative segregation and loss of 180 days commutation credits. (*Id.*) Plaintiff did not file an administrative appeal. (*Id.* at 136.)

During his deposition, Plaintiff confirmed that he was familiar with the administrative exhaustion system in place in New Jersey prisons in August 2015 and knew that exhaustion

required him to not only file a grievance, but appeal any adverse determination. (*Id.* at 236-38.)
At his deposition, Plaintiff contended that he attempted to file grievance forms after his being
placed in punitive detention following the incident, but that he did not receive responses to these
paper forms. (*Id.* at 237-38.)  These forms include an inmate inquiry form filled out on August
17, 2015, requesting to see investigators because of "physical brutality" by unspecified officers
(*id.* at 286), an inmate inquiry form submitted on August 20, 2015, requesting dental records and
to have x-rays taken of his teeth (*id.* at 288), and an inmate grievance form Plaintiff submitted on
September 21, 2015, following his transfer to Northern State Prison, alleging the same excessive
force allegations contained in his complaint. (ECF No. 58-10 at 2-9.)  Plaintiff testified at his
deposition that he never received an initial response to this last set of paper grievance forms. (ECF
No. 58-9 at 238-40.)  A second version of this grievance form provided by the state, however,
appears to show that a response was provided, but Plaintiff failed to appeal that response. (ECF
No. 58-10 at 10-13.)  Plaintiff confirmed during his deposition that these were the only paper
grievances he filled out with regards to this incident, although he did send letters to the NJ
Department of Corrections in October 2015 and October 2016, and filed an additional electronic
grievance In October 2016 which resulted in his being told the matter was closed, which he did
not appeal. (*Id.* at 238-290.)  In this October 2016 grievance, Plaintiff asserts that he previously
filed a grievance at Southern State on August 20, 2015, a statement that appears to refer to the
August 20 inquiry form discussed above.

     In a certification, Danielle Weber, the Technical Program Assistant at Southern State
Correctional Facility, in which Plaintiff was housed between the events of August 14, 2015, and
his transfer on August 31, 2015, states that inmates in the detention unit in which Plaintiff was
held during this time have full access to both paper inquiry and grievance forms, which they may
request from and return to a social worker who goes through the unit daily without interference

from guard staff.  (ECF No. 75-1 at 2-4.)  She further attests that although Plaintiff did file a pair of inquiry forms during his two week stay in the detention unit, there is no record of any grievance filed between August 14 and 31, 2015, and the prison keeps accurate and detailed records of all paper grievances.  (*Id.*)

Linda Linen, an executive assistant at South Woods State Prison, in which Plaintiff was detained between August 31 and September 14, 2015, also provided a certification regarding that prison's paper grievance system which was in place during the relevant time period.  (ECF No. 75-2 at 2-4.)  She attests that paper inquiry and grievance forms were freely available to all prisoners during that time in their housing units, and could be submitted through secured mailboxes.  (*Id.*)  She further states that the prison keeps detailed records of all filed grievance paperwork, but has no record of Plaintiff filing any grievances between August 31 and September 14.  (*Id.*)

At the evidentiary hearing, this Court heard testimony from various prison staff who essentially testified in line with the information contained in their certifications.  (ECF No. 93 at 6-122.)  Plaintiff also testified, largely in line with his prior deposition testimony.  (*Id.* at 133-155.)  During his testimony, Plaintiff testified that he was unable to file a grievance form during his stay in punitive detention during August 2015 as the staff member responsible did not provide him with the proper forms, and that his other attempts at filing grievances were unsuccessful as he never received any responses to them.  (*Id.* at 14-50.)  Having considered the testimony provided at the hearing, this Court found each of the witnesses to be generally credible, although their memories were certainly colored by the considerable passage of time since the events in question.  Turning specifically to Plaintiff, this Court found Plaintiff's testimony to be credible, and specifically credits Plaintiff's testimony that he was unable to file a grievance due to lack of access to the proper forms and in testifying that his attempts at exhaustion in September 2015 failed because his

attempts at filing a grievance related to the August 2015 incident did not result in his receiving a response.

## II.   **LEGAL STANDARD**

Pursuant to Rule 56, a court should grant a motion for summary judgment where the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of "identifying those portions of the pleadings depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A factual dispute is material "if it bears on an essential element of the plaintiff's claim," and is genuine if "a reasonable jury could find in favor of the non-moving party." *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014). In deciding a motion for summary judgment a district court must "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion," *id.*, but must not make credibility determinations or engage in any weighing of the evidence. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, [however,] there is no genuine issue for trial." *Matsuhita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Once the moving party has met this initial burden, the burden shifts to the non-moving party who must provide evidence sufficient to establish that a reasonable jury could find in the non-moving party's favor to warrant the denial of a summary judgment motion. *Lawrence v. Nat'l Westminster Bank New Jersey*, 98 F.3d 61, 65 (3d Cir. 1996); *Serodio v. Rutgers*, 27 F. Supp. 3d 546, 550 (D.N.J. 2014).

"A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial. However, the party opposing the motion for summary judgment cannot rest on mere allegations, instead it must present actual evidence that creates a genuine issue as to a material fact for trial."

*Serodio*, 27 F. Supp. 3d at 550.

## III.   DISCUSSION

### A. Exhaustion

In their motion, Defendants contend that Plaintiff failed to properly exhaust his administrative remedies prior to filing suit, and that his complaint must be dismissed as a result. Pursuant to 42 U.S.C. § 1997e, before a prisoner may file a civil rights suit challenging "prison conditions," he is required to exhaust all available administrative remedies. *Woodford v. Ngo*, 548 U.S. 81, 84-85 (2006). Indeed, a prisoner is required to "exhaust administrative remedies even where the relief sought – [such as] monetary damages – cannot be granted by the administrative process." *Id.*; *see also Booth v. Churner*, 532 U.S. 731, 734 (2001). Where an administrative procedure is available, a plaintiff seeking to challenge prison conditions via a federal civil rights action must fully and properly exhaust his administrative remedies prior to filing suit, and exceptional circumstances will not excuse a plaintiff's failure to exhaust his claims. *Ross v. Blake*, --- U.S. ---, ---, 136 S. Ct. 1850, 1856-57 (2016). This "exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002); *see also Booth v. Churner*, 206 F.3d 289, 298 (3d Cir. 2000), *aff'd*, 532 U.S. 731 (2001).

As all of Plaintiff's claims arise out of a single alleged incident of excessive force and that incident's fallout, they relate to the conditions of his prison life and are clearly subject to § 1997e's

exhaustion requirement.[1]  *Porter*, 534 U.S. at 532.   Thus, unless Plaintiff can show that administrative remedies were not available to him, his complaint must be dismissed unless he has properly exhausted all of his administrative remedies related to his claims prior to his filing suit in this matter.  *Id.*; *see also Garrett v. Wexford Health*, 938 F.3d 69, 84 (3d Cir. 2019) (complaint will be deficient and must be dismissed if the plaintiff was a prisoner when the complaint is filed and had not *already* exhausted his administrative remedies at the time of filing).   "Proper exhaustion demands compliance with [the prison's] deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Woodford*, 548 U.S. at 90-91.  To properly exhaust his claims, a prisoner must therefore seek all available administrative remedies and at least substantially comply with the applicable administrative rules and regulations imposed by the prison in which he was detained.  *Id.* at 90-103; *Small v. Camden Cnty.*, 728 F.3d 265, 272 (3d Cir. 2013) (completion of the administrative review process requires "substantial" compliance with the prison's grievance procedures).  To determine whether a prisoner has properly exhausted his claims, a court must therefore look to the administrative grievance regime of the prison facility in question to determine what steps are required to properly exhaust a claim and determine whether the plaintiff substantially complied with these steps. *See Jones v. Bock*, 549 U.S. 199, 218 (2007). As exhaustion is a threshold issue affecting the plaintiff's entitlement to relief, it is the Court, and not a jury, which determines whether a plaintiff exhausted his claims, and the Court is in turn

---

[1] Although it is true that a plaintiff who files an amended complaint following his release from prisoner need no longer meet the exhaustion requirement, Plaintiff never sought to do so in this matter, and thus his operative complaint remains subject to the prisoner exhaustion requirement. *See, e.g., Garrett*, 938 F.3d at 84.

empowered to resolve any factual disputes related to the exhaustion issue. *Small*, 728 F.3d at 269-71; *see also Paladino v. Newsome*, 885 F.3d 203, 208 (3d Cir. 2018).

In a certification and during his testimony, John Falvey, the Assistant Director of the Office of Diversity and Legal Affairs for the New Jersey Department of Corrections, has provided the following summary of the rules applicable to the administrative remedy system at place in New Jersey Prisons. (*See* ECF No. 58-12 at 1-8.) Although the prisons now use both paper and electronic remedy systems, at the time in question in 2015 only the paper system was widely available. (*Id.* at 2.) Regardless, the rules for exhaustion are the same for both systems. (*Id.*) There are two types of remedy form – inquiry forms used "to make routine inquiries" which may not be appealed and do not constitute exhaustion of remedies, and inmate grievance forms which are utilized to exhaust administrative remedies. (*Id* at 3.) Inmates normally must file a grievance form within ten days of the date of the incident or issue in question. (*Id.*) Where an inmate instead first submits an inquiry form, he must instead submit his grievance within fifteen days after the submission of the inquiry form, even if he did not receive a response to his inquiry form. (*Id.*) Under prison guidelines, prisoners should receive a response to a proper grievance within thirty days, and may appeal any adverse or unsatisfactory response within ten days of receiving it. (*Id.* at 4.) An inmate will only properly exhaust his administrative remedies where he submits a grievance, receives a response, and appeals that response, ultimately receiving a final determination from prison administration within ten working days of his appeal. (*Id.*) These same rules now apply to the newer electronic system, known as the JPAY system, which was put into place in various prisons between mid-2015 and early 2016. (*Id.* at 2, 6.)

In this matter, Plaintiff filed a few inquiry forms while in punitive detention in August 2015, which referenced the events of the alleged assault, but did not file a grievance during August 2015. Plaintiff did not file a grievance as to those events until September 21, 2015 – after his time

8

his time for filing a timely grievance had passed. The record further indicates that even when Plaintiff did eventually file untimely grievances in September 2015 and October 2016, he did not appeal them – either because Plaintiff did not receive the denial as Plaintiff testified regarding the September 2015 grievance, or because he believed the matter was closed as he testified as to the October 2016 grievance. The record thus indicates that Plaintiff did not successfully exhaust his claims.

The question that remains, however, is whether the prison's grievance system was actually "available" to Plaintiff during the relevant period during which he could have filed a timely grievance. As the Supreme Court has explained, "the exhaustion requirement hinges on the 'availab[ility]' of administrative remedies: An inmate, that is, must exhaust available remedies, but need not exhaust unavailable ones." *Ross*, 578 U.S. at 642. A remedy is available only where it is "capable of use for the accomplishment of a purpose" and is "accessible." *Id.* A remedy system will be unavailable where it operates as a simple "dead end," or where the system, though theoretically useable, is "practically speaking, incapable of use." *Id.* at 643-44. Such a situation will arise where prison officials "thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 644.

During his testimony in this matter, Plaintiff credibly testified that, during his period of segregated confinement during the latter half of August 2015, he was unable to file a grievance form as the staff member responsible for handing out the forms would not provide him with the proper form and only permitted him inquiry forms. He likewise testified that, when he did attempt to file grievances after a series of rapid prison transfers in August and September 2015, he was only able to file grievance forms through the use of an intermediary – those he attempted to submit himself either disappeared or, to Plaintiff's knowledge, went unanswered. Although there is some evidence in the record that jail staff did issue a decision as to Plaintiff's September 2015 grievance,

9

there is no clear evidence in the record that this response was ever actually received by Plaintiff, and Plaintiff testified during his deposition that he did not receive that response, while providing a copy of the grievance which did not contain the response. As this Court finds Plaintiff's testimony credible – and the Court finds that the general practice testimony provided by Defendants does not directly undermine Plaintiff's credibility as to the specific circumstances he faced – this Court can only conclude that the administrative remedy system was not available to Plaintiff during the period during which he could have filed a timely grievance. Plaintiff was not provided with the necessary forms, forms submitted were either not received or were not properly returned to Plaintiff, and Plaintiff was in any event subjected to a number of transfers in short order during the relevant period that further hindered his ability to engage in the grievance process even putting aside the injuries he suffered during the August 2015 incident. Because this Court therefore concludes that the remedies were not truly available to Plaintiff for proper use during the relevant time period in August and September 2015, his failure to properly exhaust his claims before filing suit is excused. *Ross*, 578 U.S. at 642-44.

## B. Defendants' *Heck* argument

In their motion for summary judgment, Defendants also argue that Plaintiff should be prohibited from testifying at any forthcoming trial that he did not throw a water bottle as any such testimony would be contrary to his prison disciplinary finding of guilt for doing so. Defendants are thus attempting to use the *Heck* doctrine to preclude testimony rather than to bar Plaintiff's claims. Under the *Heck* doctrine, a federal civil rights action "will not lie when a state prisoner challenges the fact or duration of his confinement," nor may such a prisoner use a civil rights claim to seek either his "immediate release" or a "shortening" of his term of confinement. *Wilkinson v. Dotson*, 544 U.S. 74, 79 (2005). The *Heck* doctrine goes one step further, however, and also bars any civil rights claim for money damages where the success of that claim would impugn the

10

validity of a prisoner's conviction, sentence, or the duration of that sentence. *Id.* Thus, absent the prior invalidation of a prisoner's conviction, sentence, or disciplinary proceeding affecting the length of a prisoner's sentence, a state prisoner's civil rights suit "is barred (absent prior invalidation) – no matter the relief sought (damages or equitable relief), no matter the target of the prisoner's suit (state conduct leading to conviction or internal prison proceedings) – *if* success in that action would necessarily demonstrate the invalidity of [his] confinement or its duration." *Id.* at 81-82.  The *Heck* doctrine is thus a doctrine which bars a claim entirely – effectively delaying its accrual – unless and until an underlying conviction or disciplinary punishment has been overturned.

Plaintiff's claim in this case is one for excessive force – a claim which rises and falls with whether the force applied to Plaintiff was either used "in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Ricks v. Shover*, 891 F.3d 468, 480 (3d Cir. 2018) (quoting *Smith v. Mensinger*, 293 F.3d 641, 649 (3d Cir. 2002)).  Evaluating such a claim requires courts look at a number of factors including: "(1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of the injury inflicted; (4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of facts known to them; and (5) any efforts made to temper the severity of the forceful response." *Id.* (quoting *Smith*, 293 F.3d at 649).  Inherent in the nature of this analysis is the clear conclusion that an Eighth Amendment excessive force claim may prevail even where the plaintiff's own actions instigated a legitimate physical response, but the officers considerably exceeded the necessary amount of force in mounting their response. *See, e.g.*, *Jacobs v. Bayha*, 616 F. App'x 507, 513-14 (3d Cir. 2015).  Thus, even if Plaintiff did throw the bottle as claimed by the guards and found during a disciplinary proceeding, the force used against him may still be so excessive as to violate his rights.  Thus, a jury could find for Plaintiff

even if it rejected any testimony that Plaintiff did not throw a water bottle, and Plaintiff's success

on his claims would not necessarily imply the invalidity of Plaintiff's disciplinary proceedings.

Plaintiff's claim is thus clearly not barred by the *Heck* doctrine, a point which Defendants' do not

truly dispute. Instead, they seek to expand *Heck* into a doctrine of preclusion as to specific points

of testimony. The *Heck* doctrine, however, has never clearly been held to provide a basis for issue

preclusion by the Supreme Court or Court of Appeals, *see, e.g., Ruiz v. N.J. Dep't of Corr.*, No.

15-3304, 2020 WL 2111013, at *6 (D.N.J. May 1, 2020) (citing *Simpson v. Thomas*, 528 F.3d 685,

694 (9th Cir. 2008)). *Heck*, then, does not provide the basis for issue preclusion that Defendants

assert, and the request for issue preclusion based on *Heck* is denied at this time.[2]

### C. Plaintiff's claims against Defendant Powell

Defendants next contend that Defendant Powell is entitled to summary judgment as

Plaintiff has failed to produce facts sufficient to show his involvement in the alleged wrongdoing.

Plaintiff, in response, contends that Powell became involved in the attack upon him by at least

---

[2] Although *Heck* provides no basis for issue preclusion, binding authority does provide that even unreviewed state administrative proceedings "should be given preclusive effect in subsequent section 1983 actions." *Roth v. Koppers Indus., Inc.*, 993 F2d. 1058, 1061 (3d Cir. 1993). Thus, "when a state agency acting in a judicial capacity . . . resolves disputed factual issues of fact properly before it which the parties have had an adequate opportunity to litigate, federal courts must give the agency's factfinding the same preclusive effect it would be entitled to in the State's courts." *Id.* at 1062 n. 3 (quoting *University of Tennessee v. Elliott*, 478 U.S. 788, 799 (1986)). As New Jersey accords preclusive effects to quasi-judicial administrative proceedings so long as they have significant procedural and substantive safeguards, *see Winters v. N. Hudson Reg. Fire & Rescue*, 212 N.J. 67, 87 (2012), and New Jersey provides considerable protections in prison administrative proceedings, *see Avant v. Clifford*, 67 N.J. 496 (1975), it may well be the case that general issue preclusion or collateral estoppel principles may provide a basis to estop or preclude Plaintiff from disputing his behavior prior to the attack at any trial in this matter. As the parties have not actually litigated the more general preclusion issue, however, this Court need not address it at this time. To the extent Defendants believe that issue preclusion or collateral estoppel principles in general warrant this Court precluding Plaintiff from testifying that he did not threaten the officers or did not act aggressively towards them, they may raise that issue via a motion *in limine* prior to trial.

tacitly approving of Woolson's use of OC spray upon Plaintiff insomuch as Powell failed to disapprove of it, which Plaintiff believes is evidence of a policy or practice of permitting the use of the spray "to inflict punishment." To be held responsible for a civil rights claim, a defendant must have "personal involvement" in the alleged wrong; a claim may not be premised solely on vicarious liability. *Chavarriaga v. N.J. Dep't of Corr.*, 806 F.3d 210, 222 (3d Cir. 2015) (citing *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988)). A supervisor may therefore only be held liable where she either created a policy which caused the alleged wrong, participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinate's violations." *Murphy v. Middlesex County*, 361 F. Supp. 3d 376, 387 (D.N.J. 2019) (citing *Baker v. Monroe Township*, 50 F.3d 1186, 1190-91 (3d Cir. 1995)). To succeed on a knowledge and acquiescence theory, the plaintiff must show that the supervisor had actual, rather than constructive, contemporaneous knowledge of the wrongdoing and took no action to curtail it thus evincing his deliberate indifference. *Rode*, 845 F.2d at 1207; *Chavarriaga*, 806 F.3d at 222. To alternatively establish a claim based on the adoption of a policy, a plaintiff must prove that the supervisor "established or enforced policies and practices directly causing the constitutional violation" in question. *Chavarriaga*, 806 F.3d at 223. Making such a showing requires that the plaintiff identify the policy, custom, or practice in question specifically. *McTernan v. City of York*, 564 F.3d 636, 658 (3d Cir. 2009). A failure to train or supervise claim is a subset of policy adoption claim which requires a showing that the failure to adopt further training policies amounts to "deliberate indifference to the rights of persons with whom [the defendant's] employees will come into contact." *Carter v. City of Philadelphia*, 181 F.3d 339, 357 (3d Cir. 1999) (internal quotations omitted); *see also City of Canton v. Harris*, 489 U.S. 378, 388 (1989). This will generally require a showing that "the need for more or different training is

obvious, and [this] inadequacy [is] very likely to result in violation of constitutional rights." *Carter*, 181 F.3d at 357.

Plaintiff argues that his claim against Powell should survive because Powell did not sufficiently disclaim Woolson's actions after the fact, indicating either knowledge and acquiescence or a failure to train. Both arguments, however, are backward looking – they do not rely on any contemporaneous knowledge of the wrongdoing or the need for training which permits the inference of personal involvement in the attack on Plaintiff, and instead seek to hold Powell liable "to the extent" that the attack "came to the attention of Powell." (ECF No. 66 at 35.) Nothing in the record indicates that Powell had any pre-existing knowledge that Woolson or Tracey posed a specific threat to Plaintiff, nor has Plaintiff provided evidence indicating a clear pattern of similar uses of OC spray or similar attacks on inmates at the facility in which Plaintiff was housed at the time – the Ancora satellite facility – to support the inference that Powell knew or should have known of a need for a more developed policy, especially in light of the fact that the NJDOC already *has* a restrictive use of force policy applicable to both types of incidents. Indeed, the testimony during Powell's deposition indicates that the specific instances of excessive force Plaintiff identified at Bayside either occurred long before Powell's arrival at the prison, or occurred at locations that Powell did not recognize as being a part of the prison at all. (*See* ECF No. 58-10 at 21-23.) Thus, the record does not indicate that there was a clear and obvious inadequacy of training, especially in light of the NJDOC's use of force policy, that would give rise to the inference that Powell failed to adopt an adequate training regime. As the record is also devoid of any contemporaneous, actual knowledge of the attack on Plaintiff, as opposed to his learning of it sometime after the fact, Plaintiff has failed to show facts sufficient to permit a jury to infer that Powell was actually involved in the assault upon him or adopted policies that were the moving

force behind the alleged assault. Powell is therefore entitled to summary judgment as to Plaintiff's claims against him.

### D. Plaintiff's OC spray claim against Officer Tracey

The parties agree that the record indicates that Officer Tracey did not use OC spray on Plaintiff, and that Plaintiff's claim against him related to its use must therefore be dismissed. (*See* ECF No. 66 at 35; ECF No. 58-1 at 39.)   Judgment must therefore be entered in relation to Plaintiff's OC spray claims in favor of Defendant Tracey.

### E. Plaintiff's OC spray claims against Defendant Woolson

In their final series of arguments, Defendants contend that Woolson is entitled to summary judgment as to Plaintiff's OC spray related claims as Woolson is entitled to qualified immunity as to those claims.  Defendants do not appear to argue, and this Court does not construe them to be arguing, that Woolson is entitled to qualified immunity as to the alleged attack on Plaintiff after the OC spray was deployed, and to be moving only as to the initial use of the OC spray.[3]  "The doctrine of qualified immunity shields government officials who perform discretionary functions 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Santini v. Fuentes*, 795 F.3d 410, 417 (3d Cir. 2015) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  "When properly applied, [qualified immunity] protects all but the plainly incompetent or those who knowingly violate the law." *Spady v. Bethlehem Area Sch. Dist.*, 800 F.3d 633, 637 (3d Cir. 2015) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, (2011)).  In determining whether immunity

---

[3] Although the two instances are separable insomuch as the use of the OC spray was first, and followed by the alleged assault a short time later after Plaintiff had, at least, attempted to retreat, that OC had been used prior to the alleged assault with a flashlight or the like would be entirely relevant to whether *that* use of force was excessive at trial, notwithstanding any grant of qualified immunity as to the initial use of OC spray.

applies, courts use a two pronged test: "a court must decide 'whether the facts that a plaintiff has .
. . shown make out a violation of a constitutional right'[, a]nd second, the Court must determine
'whether the right at issue was clearly established at the time of [the] defendants alleged
misconduct.'" *Id.* (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)).

For a claim to be clearly established, "existing precedent [must have] placed the . . .
constitutional [right in] question *beyond debate.*" *Id.* at 638.  With the exception of cases involving
"obvious violations" of prior Supreme Court rulings, a plaintiff's claim will only be "clearly
established" where "the violative nature of the *particular* conduct [was] clearly established."
*James v. New Jersey State Pol.*, 957 F.3d 165, 169 (3d Cir. 2020).  The conduct in question must
therefore be defined at an "appropriate level of specificity," *Spady*, 800 F.3d at 638, and, when so
defined, the plaintiff must identify "a case where an officer acting under similar circumstances . .
. was held to have violated" the constitutional provision in question. *James*, 957 F.3d at 169-70.
For the purposes of this analysis, "clearly established rights are derived either from binding
Supreme Court and Third Circuit precedent or from a robust consensus of cases of persuasive
authority in the Courts of Appeals" in effect at the time of the conduct in question. *Id.* at 170.

At his deposition, Officer Woolson testified that Plaintiff threw a bottle of liquid at him,
splashing him in the process, and Woolson responded by calling in a disciplinary code and then
spraying Plaintiff with OC spray seconds later from ten to twelve feet away. Plaintiff in turn
testified at his own deposition that Woolson wanted to "get him" and maced him while he was
filling up a water bottle, which he then dropped.  Plaintiff testified that he was thereafter tackled
and beaten with a flashlight, a claim the Defendants deny.  Photographic evidence in the record
clearly indicates that Officer Woolson was struck with liquid, and that Plaintiff suffered significant
damage to his mouth area and bled.  (ECF No. 58-7 at 15-18.)  Taking all of these facts together,
and viewing them in the light most favorable to the non-moving party, these facts suggests that

either while filling up a water bottle or after, Plaintiff – purposefully or inadvertently – splashed Woolson, who deployed OC spray without first providing commands or orders, and the officers thereafter forcefully restrained Plaintiff.

Defined at the appropriate level of particularity, the conduct at issue here is the deploying of OC spray, without first issuing a command or order to stop, upon a prisoner after being splashed with liquid. A jury who credited Plaintiff's version of events could infer that this use was excessive. As outlined above, to find the use of force excessive, a jury would have to find that the force in question was used not to restore order, but instead to inflict harm. *Ricks*, 891 F.3d at 480. In making that decision, one must consider the need for the force, the relationship between that need and the amount of force used, the extent of the injury, the extent of the threat posed to others by the plaintiff, and any efforts to temper the severity of the force. *Id.* Viewed in the light most favorable to Plaintiff, there was only a limited need for an application of force – Plaintiff at worst purposely splashed Woolson with a clear liquid that Woolson found surprising more than threatening, Plaintiff's actions posed little threat to anyone after the water had been splashed, and Woolson made no efforts to temper the need for force by issuing orders to Plaintiff before deploying the OC spray – by his own admission he called a code and then immediately sprayed Plaintiff before even approaching him. Viewing these facts together, a jury could infer that Woolson's use of the spray was not a good faith effort at attempting to restore order, but rather an action taken to inflict harm on Plaintiff out of anger for being splashed.

The question of whether such a violation was clearly established in 2015, however, is much more difficult. Although it is clear that the use of gratuitous force, including OC spray, against a restrained or non-resisting inmate amounts to an established violation of the Eighth Amendment, *see, e.g., Sledge v. Martin*, No. 21-348, 2023 WL 2332464, at *6-7 (W.D. Pa. Mar. 2, 2023) (collecting cases), there is also caselaw which indicates that the use of OC spray to obtain

compliance after issuing an order to an inmate "does not violate any rights." *See, e.g., Spada v. Houghton*, No. 20-223, 2022 WL 4280519, at *2 (W.D. Pa. July 22, 2022); *see also Soto v. Dickey*, 744 F.2d 1260, 1270 (4th Cir. 1984). This case falls somewhere between the two lines of cases – an officer in Woolson's position could conclude that Plaintiff's splashing of the liquid was disruptive behavior meriting a response, but Woolson made no effort to order or attempt to restrain Plaintiff prior to employing OC spray without verbal warning. Likewise, Plaintiff was not restrained at the time, but he had also not yet failed to properly respond to a verbal command before the spray was used. Having reviewed the available caselaw, this Court could find no binding precedent which put beyond question the issue of whether there is a clearly established right of a prisoner to be free from being pepper sprayed after splashing a guard with water, and at least some persuasive precedent suggests to the contrary. *See, e.g., Williams v. Benjamin*, 77 F.3d 756, 763 (4th Cir. 1996) (short burst of mace used after inmates threw water on guards did not violate Eighth Amendment). As there is no clear case which clearly establishes the right in question here, this Court must grant Defendant Woolson qualified immunity as to the use of OC spray and enter judgment in his favor as to that issue only.[4]

---

[4] The Court reiterates, however, that Defendants have neither argued or shown that either Tracey or Woolson are entitled to qualified immunity for the beating Plaintiff asserts they gave him unnecessarily *after* the deployment of the pepper spray, and that the prior use of pepper spray may be directly relevant to the question of whether *that* use of force was excessive.

IV.  **CONCLUSION**

In conclusion, Defendants' Motion for Summary Judgment (ECF No. 58) is granted in part and denied in part.  Judgment shall be entered in favor of Defendant Powell as to all of Plaintiff's claims, and entered in favor of Defendants Tracey and Woolson only as to Plaintiff's claims related to the use of OC spray.  Defendants Tracey and Woolson have not shown an entitlement to summary judgment as to Plaintiff's claims related to the alleged beating with a metal object after the use of the OC spray, and those claims remain before the Court.  An appropriate order follows.

Hon) Karen M. Williams,
United States District Judge