IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **Milton Neal,** | : |
| Plaintiff, | : |
| v. | : No. 1:17-cv-04768-KMW-MJS |
| **SCO D. Woolson, SCO S. Tracey,** | : |
| Defendants. | : |

### BRIEF IN SUPPORT OF PLAINTIFF'S MOTION
### FOR SANCTIONS BASED ON SPOLIATION OF EVIDENCE

Plaintiff Milton Neal, through counsel, moves the Court for sanctions based on the New Jersey Department of Corrections' ("DOC") spoliation of evidence as to the cause and extent of Mr. Neal's injuries by withholding more than 20 x-ray scans of his mouth.

Following the August 14, 2015 assault at issue in this case, Mr. Neal required extensive dental healthcare, which necessitated DOC and DOC-contracted providers to take multiple x-ray scans of his mouth over several months. Mr. Neal and his advocates made several pre-litigation and mid-litigation requests for copies of these x-rays both while he was incarcerated in DOC custody and after his release. Several of these requests were made while Mr. Neal was still receiving dental care within the DOC and the x-rays in question were still being created. The DOC has stated that it cannot produce the x-rays, despite having clearly possessed them throughout Mr. Neal's incarceration and generally maintaining a reliable method for storing x-ray records during and after an incarcerated person's period of custody. These withheld x-rays are critical to Mr. Neal's claims, both as to defendants' liability in causing his injuries and to the extent of those injuries. Without access to them, Mr. Neal has been substantially prejudiced.

Therefore, in the interest of redressing that prejudice, Mr. Neal moves the Court to sanction defendants through an adverse inference jury instruction stating that the x-rays, were they to have been produced, would have been unfavorable to defendants.

## I.     Factual Background

### A.  August 14, 2015 Assault and Mr. Neal's Injuries

Mr. Neal brought this suit in response to defendants Woolson and Tracey, two correctional officers employed by the DOC, hitting him in the face and mouth with a metal object and causing severe dental injuries while he was incarcerated in Bayside State Prison's minimum security Ancora satellite facility. Mr. Neal alleges that on August 14, 2015 after firing pepper spray directly into his face despite a complete absence of provocation, defendants Woolson and Tracey then followed Mr. Neal up a flight of stairs, took him to the ground, and beat him in the face several times with, by Mr. Neal's recollection, a black metal flashlight. As a result of this beating, Mr. Neal was left with serious injuries to his mouth including the loss, chipping, and loosening of several teeth.

Defendants, by contrast, assert that Mr. Neal precipitated the incident that caused his injuries when he threw a water bottle at defendant Woolson. In response, defendants contend, Woolson pepper sprayed Mr. Neal, then followed him up the stairs where Mr. Neal fell, landing on his face and suffering injuries to his mouth.

Defendants initiated a Special Investigations Division ("SID") investigation of the incident, framing it as an assault on the officers by Mr. Neal. *See* Exhibit 1, February 3, 2023 Evidentiary Hearing Transcript, SID Investigator Gardner Testimony 109:7-13. Mr. Neal gave a

2

full account of the assault to SID Investigator John Gardner on August 19, 2015. *See* Exhibit 2[1], SID Report, 2. The SID investigation report found no misconduct on the part of defendants, and, in so doing, relied heavily on DOC dental provider Dr. Jennifer Hobbs's characterizations of Mr. Neal's post-assault x-rays (radiographs) and an x-ray taken upon Mr. Neal's intake in 2010[2] to dispute Mr. Neal's description of the incident. *Id* at 3. Specifically, Dr. Hobbs stated regarding the tooth that Mr. Neal lost in the assault: "Given that the other maxillary anterior [top front] teeth were not avulsed or otherwise fractured and only minor soft tissue bruising was noted on exam, it is possible that the presence of gum disease contributed to the loss of #10." *Id*. This characterization, however, is facially in conflict with other evidence. In contrast to Dr. Hobb's statement, photographs of Mr. Neal's mouth taken shortly after the incident show that his two top front teeth next to the missing tooth #10 are visibly broken. *See* Exhibit 4, Photo of Mr. Neal.[3]

Whatever the SID report's representations, it is undisputed that Mr. Neal suffered severe dental injuries on August 14, 2015. According to his DOC medical records from the day of the incident, Mr. Neal lost a top left lateral tooth, both top front teeth were chipped diagonally, a bottom left lateral tooth was chipped diagonally, and his bottom two center teeth were loose. *See*

---

[1] The SID report comprising Exhibit 2 is subject to a confidentiality order and will be provided contemporaneously with this filing to the Court and to Defense counsel via email.

[2] The 2010 x-ray of Mr. Neal's mouth is the only x-ray that defendants have located and produced. Exhibit 3, 2010 X-ray (Neal v. Powell 61).

[3] Mr. Neal alleges that this SID investigation was part of an effort to cover up and justify defendants' use of excessive force. In fact, Jamal Sanders, the sole non-DOC employee witness to the incident whose account is cited in the report apart from Mr. Neal, has recently affirmed that a statement attributed to him that purportedly exonerated the officers of misconduct was entirely fabricated and coerced by correctional staff. *Compare* Exhibit 5, August 26, 2015 Sanders Statement *with* Exhibit 6, November 8, 2023 Sanders Declaration.

Exhibit 7, Neal Medical Records Excerpt (M.Neal.MED 308). Indeed, the defendants' dental expert, Dr. Leonard F. Tau, concluded that, "the damage sustained was not due to some disease process in Milton Neal's mouth such as periodontal disease or a gum infection. The damage was due to something coming into contact with his teeth." Exhibit 8, Tau Expert Report, 1.

### B. Three Years of Dental Treatment in DOC Facilities

In the three years after the incident, Mr. Neal lost five teeth in addition to the one he lost during the assault on August 14, 2015. *See* Exhibit 9 Draft Joint Pretrial Order, Stipulated Facts ¶ 26.[4] Mr. Neal's medical records reference numerous x-rays (referred to in DOC records as radiographs) that were taken as part of his dental treatment:

- On August 24, 2015, six x-rays were taken at Southern State Correctional Facility. Exhibit 7, M.Neal.MED 299-300;

- On September 8, 2015, at least one x-ray was taken at South Woods State Prison. *Id.* at M.Neal.MED 292;

- On September 24, 2015, four x-rays were taken at Northern State Prison. *Id.* at M.Neal.MED 283-285;

- On January 27, 2016, one x-ray was taken at Northern State Prison. *Id.* at M.Neal.MED 258-259;

- On September 13, 2016, two x-rays were taken at East Jersey State Prison. *Id.* at M.Neal.MED 182-183;

- On February 27, 2017, one x-ray was taken at East Jersey State Prison. *Id.* at M.Neal.MED 147-148;

---

[4] A revised version of the Joint Final Pretrial Order will be filed as directed by the Court. The parties have confirmed that the cited stipulated factual statement set forth in the original draft will not be changed in the new version.

- On June 19, 2017, one x-ray was taken at East Jersey State Prison. *Id.* at M.Neal.MED 124;

- On December 21, 2017, one x-ray was taken at East Jersey State Prison. *Id.* at M.Neal.MED 63-64;

- On April 13, 2018, three x-rays were taken at Northern State Prison. *Id.* at M.Neal.MED 26;

- On May 15, 2018, three x-rays were taken at Northern State Prison. *Id.* at M.Neal.MED 4.

In total, DOC dental care providers took at least 23 x-rays of Mr. Neal's teeth between August 24, 2015 and May 15, 2018.

### C. Mr. Neal's Requests for his X-Rays

Mr. Neal and his representatives began requesting his dental records, including x-rays, soon after the August 14, 2015 assault. On August 17, 2015, Mr. Neal wrote an Inmate Inquiry Form stating, "Inmate Neal requests dental records to have x-rays." Exhibit 10, Inquiry Form.[5] On August 23, 2015, a representative from the American Friends Service Committee ("AFSC") wrote a letter on Mr. Neal's behalf to Gary Lanigan, Commissioner of the DOC, asking for "all evidence relevant to an understanding of the incident" to be "gathered and preserved." Exhibit 12, AFSC Letter.

---

[5] Although there has been some dispute as to whether Mr. Neal filed the specific Inmate Inquiry form attached as Exhibit 10, Danielle Weber, Southern State Correctional Facility's Technical Program Assistant, has certified that Mr. Neal did submit *an* Inmate Inquiry form in August 2015 requesting dental records and x-rays and that this form was received by the facility. Exhibit 11, Second Certification of Danielle Weber, ¶ 13.

Mr. Neal then reported the details of the assault and the injuries he experienced through numerous inquiry and grievance forms.[6] Prior to Mr. Neal's release from DOC custody, he filed this lawsuit on June 28, 2017, detailing the injuries to his mouth and teeth. *See* ECF 1, Complaint. On May 25, 2018, while Mr. Neal was still incarcerated in the DOC, his counsel served on defendants a single request for production of documents for all of his medical records "generated by providers of medical services to Plaintiff by or through the New Jersey Department of Corrections." Exhibit 13, May 27, 2018 Document Request.

On August 7, 2019, Mr. Neal's attorney followed up on the May 2018 request with a letter noting that the produced medical records referred to, but did not include, Mr. Neal's dental x-rays and specifically requesting defendants produce those x-rays. Exhibit 14, August 7, 2019 Letter. Defense counsel responded to this request with an email stating that he was not in possession of any x-rays, directing Mr. Neal's counsel to "outside entities such as Mobile-X," which may have taken the x-rays, and requesting that Mr. Neal's counsel provide copies of medical records indicating that x-rays were, in fact, taken. Exhibit 15, Emails between Counsel, 11. Within a few days, Mr. Neal's counsel responded with medical records documenting each x-ray and a HIPPA release to facilitate production from any contracted entities, to which defendants' counsel did not respond. *Id.* at 10-11. About six weeks later, after a follow-up email from Mr. Neal's counsel, defendants' counsel replied that he had made a corresponding request to the DOC for records. *Id.* at 10. Mr. Neal's counsel continued to follow-up regarding the requests for x-rays in October 2019, January 2020, February 2020, and April 2020, receiving only conflicting and inadequate responses from defense counsel. *Id.* at 3-9.

---

[6] After an evidentiary hearing, Judge Williams determined that he had exhausted all administrative remedies that were actually available to him. *See* ECF 95, June 22, 2023 Summary Judgment Opinion, 10.

6

On January 9, 2020, defense counsel emailed Mr. Neal's counsel to explain that the x-rays were not in Mr. Neal's hard copy medical file, "which would contain the x-ray images," assuring Mr. Neal's counsel that "they are still looking." *Id.* at 8. On March 9, 2020, defendants' counsel provided a certification from Dr. Colella explaining that the x-rays had still not been located. *Id.* at 4; Exhibit 16, Louis Colella Certification. Dr. Colella certified that "generally, all dental x-rays are maintained in an inmate's hard copy chart." *Id.* at 2. He further explained that "an Inmate's hard copy chart is maintained by University Correctional Health Care/Rutgers University ["UCHC/Rutgers"] medical staff members at prison facilities." *Id.* According to his certification, Dr. Colella asked Cindy Romano, Medical Records Director of UCHC/Rutgers to locate Mr. Neal's x-rays, but she was unable to find them. *Id.*

Dr. Colella noted that "generally, when an inmate is released from DOC custody, their custody records will be sent to [Central Reception and Assignment Facility ("CRAF")]" within the DOC. *Id.* He concluded that, "Ms. Romano and her staff have searched all locations likely to contain the records. That they have not been found indicates that they may have been misfiled." *Id.* at 3. Since that time, DOC has not documented any further efforts to address any purported misfiling or to otherwise locate the x-rays. Nor has DOC provided an explanation as to when or why the x-rays were removed from Mr. Neal's hard copy medical file.

In his May 28, 2020 deposition, Dr. Eugene Vane, one of Mr. Neal's DOC dental care providers, confirmed that he took several x-rays of Mr. Neal's mouth during the course of his treatment and described the typical x-ray storage procedures in the DOC. Exhibit 17, Dr. Vane Deposition, 24:20-27:7. Dr. Vane explained that x-rays are contained in the records room of the facility in which the incarcerated person is housed and that these physical files are moved from facility to facility when the incarcerated person is transferred. *Id.* at 25:16-26:7.

7

Dr. Vane also confirmed that it was his understanding that the DOC, rather than Rutgers, stores incarcerated peoples' x-rays, "because basically Rutgers is only supplying the employees." *Id.* at 69:3-17. As to Mr. Neal's x-rays, Dr. Vane did not recall being aware that they were missing. *Id.* at 72:3-7. In fact, Dr. Vane could not remember ever being unable to view any of Mr. Neal's x-rays while treating him and stated that, "typically the records department is very good. And when we take an x-ray, that x-ray is in their records." *Id.* at 71:18-72:1.

In June 2020, Mr. Neal's counsel served a subpoena on Dr. Colella in his capacity as the Director of Dental Services for the DOC, seeking production of "any and all dental records and/or x-rays of Milton Neal generated by any dental care or medical care provider for Milton Neal while under the care or control of the New Jersey Department of Corrections." Exhibit 15 at 1; Exhibit 18, June 15, 2020 Subpoena. Mr. Neal received no response to the subpoena.

As the case has approached trial, DOC has yet to produce any x-rays. At an October 16, 2023 pretrial conference, defense counsel, having been unable to explain the absence of the x-rays, informed the Court that they were likely not within the control or custody of the DOC and that Rutgers maintains DOC patient dental records, including x-rays. Counsel made this representation despite the fact that it was directly inconsistent with Dr. Colella's certification and Dr. Vane's deposition testimony and neither that certification or deposition testimony has been modified or corrected.

As a result of the DOC's failure to produce the x-rays in this case, neither the defendants' dental expert nor Mr. Neal's dental expert were able to review the x-rays before forming their opinions regarding the cause of Mr. Neal's injuries and the resulting damages. Both experts explained that this hampered their review of the case, however the defendants' expert, Dr. Tau, still managed to form the opinion that Mr. Neal's injuries were caused by a fall, and not by a

8

strike to his face. Dr. Tau noted, "unfortunately, it seems that radiographs have not been located and made available to me for examination which makes my determination of the cause of the injuries more difficult but not impossible." Exhibit 8 at 1. Mr. Neal's expert, Dr. Julie Kardon, explained that "the absence of the x-rays renders more difficult the analysis of certain aspects of the case, particularly in the matter of what fix or remedy for the damaged teeth might make the most sense." Exhibit 19, Kardon Expert Report.

## II. Legal Standards

Spoliation of evidence occurs when "the evidence was in the party's control; the evidence is relevant to the claims or defenses in the case; there has been actual suppression or withholding of evidence; and, the duty to preserve the evidence was reasonably foreseeable to the party." *Bull v. UPS,* 665 F.3d 68, 73 (3d Cir. 2012). A litigant "even in advance of litigation...is under a duty to preserve what it knows, or reasonably should know, will likely be requested in reasonably foreseeable litigation." *Scott v. IBM Corp.,* 196 F.R.D. 233, 249 (D.N.J. 2000).

Although the Third Circuit has explained that "a finding of bad faith is pivotal to a spoliation determination," *Bull,* 665 F.3d at 79, this Court has found bad faith in a range of scenarios. For example, in *Prall v. Bocchini,* Judge Williams determined that the DOC had acted with bad faith when surveillance video footage of the plaintiff's alleged assault had been overwritten, based on inconsistent and shifting explanations offered by DOC officials. 2014 WL 12803522, at *4 (D.N.J. June 12, 2014). A DOC investigator in *Prall* initially stated that the video footage would be included in the investigation file produced in discovery, but after defendants confirmed they did not have the footage, the same investigator certified that he had previously determined it did not depict anything relevant and was therefore not necessary to maintain. *Id.*; *see also Prall v. Bocchini,* 2015 WL 13698719, at *2 (D. N.J. March 3, 2015)

9

(reaffirming finding of bad faith and denying motion for reconsideration on that basis); *Fairview Ritz Corp. v. Borough of Fairview,* 2013 WL 163286, at *5 (D.N.J. Jan. 15, 2013) (finding bad faith based on intentionality of conduct rather than "nefarious motive," including "multiple and conflicting representations to the Court").[7]

Once spoliation has been established, the Court has the discretion to impose a range of sanctions, with varied degrees of severity. "Potential sanctions for spoliation include: dismissal of a claim or granting judgment in favor of a prejudiced party; suppression of evidence; an adverse inference, referred to as the spoliation inference." *Mosaid Techs. Inc. v. Samsung Elecs. Co., Ltd.*, 348 F. Supp. 2d 332, 336 (D.N.J. 2004). An adverse inference "permits a jury to infer that destroyed evidence might or would have been unfavorable to the position of the offending party." *Id.* (internal quotations and citations omitted). Courts in this District have found spoliation sanctions warranted in a range of factual scenarios and "a number of courts have found that both an adverse inference and monetary sanctions are appropriate when spoliation occurs, even if that spoliation was not willful." *Fairview Ritz Corp,* 2013 WL 163286, at *9.

An adverse inference jury instruction is considered less severe than dismissal or suppression; in fact it "is regarded as a 'far lesser sanction,' and is intended to level the playing field between the parties." *N.V.E., Inc. v. Palmeroni,* 2011 WL 4407428, at *6 (D. N.J. Sept. 21, 2011); *see also Mosaid Techs, Inc.*, 348 F. Supp. 2d at 337 ("primarily, the spoliation inference serves a remedial function—leveling the playing field after a party has destroyed or withheld relevant evidence."). In prisoner rights cases, when liability hinges upon a factual dispute between an incarcerated person and prison staff, courts have emphasized the need to level the

---

[7] The spoliation sanction was reversed on motion for reconsideration based on the spoliating party's eventual production of the document in question. *Fairview Ritz Corp. v. Borough of Fairview,*, 2013 WL 5435060, at *1 (D.N.J. Sept. 27, 2013).

10

playing field, particularly when the evidence at issue is objective, non-testimonial evidence. *Kounelis v. Sherrer,* 529 F. Supp. 2d 503, 521 (D.N.J. 2008) (with regard to spoliated video surveillance, "it was an abuse of discretion to deny the request for an adverse inference charge. [The defendant's] testimony is challenged by the testimony of an array of SCOs, thus putting the word of a convicted felon against the collective testimony of the prison authorities.").

When balancing the degree of the spoliating party's culpability against the prejudice resulting from the withholding of the evidence in question, courts have endorsed a flexible approach. *Mosaid Techs, Inc.* 348 F. Supp. 2d at 337. Even when the spoliating party evinces a lower level of culpability, when "the opposing party has been prejudiced" a Court's imposition of a spoliation inference may be necessary to "protect[] the integrity of its proceedings and the administration of justice." *Id.* Courts in this District have "[found] this flexible approach particularly persuasive in light of the complimentary flexibility that the Court maintains to tailor jury instructions to the needs of the specific cases." *U.S. v. Suarez*, 2010 WL 4226524, at *8 (D.N.J. Oct. 21, 2010).

### III. Argument

#### A. Spoliation of evidence has occurred as to Mr. Neal's x-rays.

The DOC's failure to produce Mr. Neal's x-rays constitutes spoliation of evidence. Given the statements in the record from DOC employees, there is no question that the DOC had or should have had control over Mr. Neal's x-rays, both while he was incarcerated and upon his release. Dr. Hobbs's report provided in the context of the SID investigation confirms as much as it referred to the 2010 and 2015 x-rays to opine on the cause of Mr. Neal's injuries. SID Investigator Gardner then relied on these representations to clear defendants Woolson and Tracey of any wrongdoing. *See* Exhibit 2 at 2-3.

11

Although Rutgers employees are the primary providers of DOC dental care, both Dr. Vane, in his deposition testimony, and Dr. Colella, in his certification, explained that x-rays are maintained in DOC custody. *See* Exhibit 17, 27:3-7; 69:8-14; Exhibit 16 at 2 ("An inmate's hard copy chart is maintained by the University Correctional Health Care/Rutgers University medical staff members at the prison facilities...generally, when an inmate is released from DOC custody, their custody records will be sent to CRAF. [A]n inmate's medical records will also be sent to CRAF"). Before and after Mr. Neal's release from DOC custody, documentation produced by defendants as well as DOC medical provider testimony definitively state that Mr. Neal's x-rays have always been maintained in DOC custody.

Mr. Neal's numerous x-rays documenting the condition of his mouth directly after the alleged assault, as well as the significant dental care he received for the subsequent three years, are perhaps the most probative, indisputable evidence in this case. Mr. Neal has maintained since the day of his assault that defendants hit him in the mouth with a heavy, metal object, causing his teeth to break and loosen. Defendants claim that Mr. Neal fell on a flight of stairs, causing his injuries. Similar to the facts of *Kounelis,* the outcome of this lawsuit depends on whether the factfinder believes Mr. Neal's or the defendants' account of the events of August 14, 2015. Mr. Neal's expert explained that the x-rays are critical to understanding the extent of Mr. Neal's long-term injuries. Exhibit 19 at 1. Even the defendants' expert, Dr. Tau, noted that the x-rays are highly probative as to the immediate cause of the specific dental injuries that Mr. Neal experienced. Exhibit 8 at 1. Although the inability to review the x-rays did not prevent the defendants' expert from opining that defendants' version of events is accurate, their absence significantly hinders Mr. Neal or his expert's ability to rebut Dr. Tau's conclusions. Without this

objective evidence of the cause and scope of his injuries, Mr. Neal is substantially prejudiced in proving both liability and damages.

There is no question that the DOC was on notice of the necessity of preserving Mr. Neal's x-rays. Within a week of the assault, the DOC had a duty to preserve any treatment records of Mr. Neal's injuries, based on his submission of a prison inquiry form requesting his medical records and x-rays, his contemporaneous interview to SID describing his claims against the defendants, and a letter written by an attorney from AFSC on behalf of Mr. Neal specifically requesting preservation of evidence of the alleged assault. *See* Exhibit 10; Exhibit 2 at 2; Exhibit 12 at 1. While still in custody, Mr. Neal filed the instant lawsuit, further establishing the DOC's duty to preserve any evidence in its possession relevant to his allegations; x-ray scans of his injuries indisputably fall under this description. *See* ECF 1. Since the initiation of the lawsuit, Mr. Neal, through counsel, has diligently and repeatedly requested his x-rays, first in a formal discovery request, then a follow-up letter and numerous emails to defense counsel, including the provision of signed release forms to facilitate the process. *See* Exhibit 15. When all of these efforts failed, Mr. Neal's counsel served a subpoena on the DOC, to which he received no substantive response. Exhibit 18.

Nevertheless, the DOC, which employs and indemnifies both defendants and whose counsel has attended court proceedings on behalf of defendants, has failed to produce Mr. Neal's numerous, highly relevant x-rays, without any clear explanation as to why it cannot do so. While unsurprisingly no DOC official has admitted to destroying or hiding Mr. Neal's x-rays, defendants have provided no substantive account of how the x-rays could have been lost or where they could be stored except a vague allusion to their being potentially "misfiled." Exhibit

16 at 3. However, Dr. Colella's certification documents no efforts to search any other files to locate them.

Indeed, Dr. Colella's certification, dated in March 2020, indicates that the "search" for Mr. Neal's x-rays took place sometime after October 2019, *Id.* at 2, despite the fact that Mr. Neal put the DOC on notice of the need to preserve the scans in August 2015, filed the present lawsuit putting them at issue in June 2017, served a formal discovery request for his full medical records in May 2018, and made a follow-up request for x-rays in August 2019. Most of the x-rays at issue were taken after Mr. Neal made his initial requests to preserve documentation of his dental injuries in August 2015, and several were taken after he filed this lawsuit. In short, the DOC was on notice to preserve these x-rays as they were being created, yet less than a year after the last scan was performed, they had all seemingly disappeared.

As in *Prall,* conflicting representations as to where the x-rays are located and who maintains them have been offered to the plaintiff's counsel and the Court. After failing to provide the x-rays in response to a discovery request for Mr. Neal's entire DOC medical record and upon a further request for the x-rays in particular, defense counsel represented that the DOC does not maintain x-rays and that they would be in the possession of an outside provider, Mobile X, that is not mentioned in Mr. Neal's medical records. Exhibit 15 at 5, 11. This representation conflicted with Dr. Colella's certification documenting the expected locations of the x-rays; indeed, that certification made no mention of Mobile X or any other x-ray technician service. During a recent pretrial status conference defense counsel suggested that the x-rays were likely in stored at a Rutgers facility, despite the fact that Dr. Colella's certification makes clear that after an incarcerated person's release from custody, x-rays are not stored at a Rutgers facility, but, instead at the DOC's CRAF. Exhibit 16 at 2.

The inability to locate and produce the x-rays in question is particularly striking given the documentation and testimony in the record of the cohesiveness and general reliability of the medical file storage procedures in the DOC. Dr. Vane confirmed that the DOC's records department is "typically...very good," that he had no issues obtaining Mr. Neal's x-rays while treating him, and that all the x-rays he orders are maintained in the appropriate records. Exhibit 17 at 71:13-72:1. He explained that incarcerated persons' hard copy medical files move with them when they are transferred between facilities. *Id.* at 27:3-7. Dr. Colella also described a functional and reliable records storage system in which incarcerated people's hard copy medical files are sent to CRAF after their release. Exhibit 16 at 2. There has been no documentation offered that any other DOC hard copy medical files are missing or incomplete or that this is an existing problem within the records department.

The significance of the absent x-rays is amplified by several indications in the record that DOC employees have repeatedly hampered Mr. Neal's efforts to seek accountability for his injuries. After an extensive evidentiary hearing with numerous DOC employee witnesses, Judge Williams found Mr. Neal credible in his testimony that in the days following the assault, he was unable to file a timely report of defendants' conduct because "the staff member responsible did not provide him with the proper forms." ECF 95 at 4. The SID report documenting the DOC's investigation into Mr. Neal's allegations includes a summary of Dr. Hobbs's findings that are directly contradicted by the defendants' expert dentist, specifically that the tooth knocked out of Mr. Neal's mouth on August 14, 2015 could have been lost partially due to gum disease. *Compare* Exhibit 2 at 3 *with* Exhibit 8 at 1. The SID report also includes a statement corroborating the defendants' account of the incident attributed to Jamal Sanders, who has

recently recanted the contents of the statement and certified that DOC employees coerced and threatened him into making it. Exhibits 5 and 6.

In combination, these factors support the inference of the necessary level of intentionality and willfulness to establish that spoliation of evidence has occurred. The x-rays in question are highly relevant to Mr. Neal's claims, have never left the custody of the DOC, were foreseeably necessary to preserve, and have not been provided to Mr. Neal. The repeated, corroborated instances of misconduct by DOC employees in responding to Mr. Neal's allegations, in conjunction with the lack of plausible explanation for the x-rays' disappearance from a reliable records department, indicate that this failure to produce was not simply accidental. Given this unique factual record and the established rule that spoliation intent can be inferred from the totality of the circumstances, a finding of spoliation is warranted here.

### B. An adverse inference jury instruction is an appropriate sanction.

Given the spoliation that has occurred and the corresponding prejudice to Mr. Neal, a sanction in the form of an adverse jury instruction is necessary to level of the playing field. As numerous courts have explained, an adverse jury instruction is the least severe form of spoliation sanction. *N.V.E., Inc.*, 2011 WL 4407428, at *6; *Prall,* 2014 WL 12803522, at *5; *Bull*, 665 F.3d at 82; *Mosaid Techs. Inc.,* 348 F. Supp. 2d at 335. Even when the level of specific defendants' culpability is difficult to ascertain, an adverse inference is a reasonable and appropriate sanction to account for the prejudice incurred without unfairly punishing defendants. Mr. Neal's severe prejudice of being denied objective evidence of the cause and extent of his injuries warrants an equitable remedy, regardless of the individual actions of the defendants.

An instruction to the jury that they can infer from the absence of x-rays that the x-rays would have been unfavorable to the defendants would take account of the spoliation and properly

reduce Mr. Neal's resulting prejudice. Specifically, Mr. Neal requests that the Court instruct the jury as follows: "Members of the jury, you have heard evidence that x-rays in this case have not been produced by the Department of Corrections. You may draw the inference that those x-rays, had they been produced, would have been harmful to the defendants' case and may have contradicted the defendants' version of how Mr. Neal sustained injury to his mouth."

**IV.     Conclusion**

For the foregoing reasons, Mr. Neal's motion for sanctions should be granted and an adverse inference instruction as to the missing x-rays should be given to the jury at trial.

Respectfully submitted,

Grace Harris
Jonathan H. Feinberg
Kairys, Rudovsky, Messing, Feinberg & Lin LLP
The Cast Iron Building
718 Arch Street, Suite 501 South
Philadelphia, PA 19106
(215) 925-4400