## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

|  |  |
|---|---|
| **MILTON NEAL,**<br><br>                              **Plaintiff,**<br><br>         **v.**<br><br>**JOHN POWELL, et al.,**<br><br>                         **Defendants.** | **Civil No. 17-4768 (KMW/MJS)** |

## O P I N I O N   &   O R D E R

This matter comes before the Court on the motion for spoliation sanctions filed by plaintiff Milton Neal ("Plaintiff") [ECF No. 112]. Having considered the parties' submissions, the Court decides this matter without oral argument pursuant to Federal Rule of Civil Procedure 78(b) and Local Civil Rule 78.1(b). For the reasons that follow, Plaintiff's motion is **DENIED.**

### I.      Background

This prisoner civil rights action arises out of an August 14, 2015 incident between plaintiff Milton Neal, then an inmate housed at Bayside State Prison's Ancora facility, and the two remaining defendants, David Woolson and Shawn Tracey ("Defendants"), both corrections officers at Ancora. ECF No. 112-1 at 2. According to Plaintiff, on August 14, 2015, he was filling a water bottle at a water fountain when Defendants approached him, and, without any provocation, fired pepper spray directly into Plaintiff's face. ECF No. 95 at 1-2; ECF No. 112-1 at 2. Defendants, by contrast, assert that Plaintiff instigated the incident by throwing a water bottle at Woolson, prompting Woolson to pepper spray Plaintiff. ECF No. 112-1 at 2. Both parties agree that after Plaintiff was pepper spayed, Plaintiff fled up a flight of stairs to wash out his eyes. ECF

No. 95 at 2. Defendants followed Plaintiff up the stairs, ordered Plaintiff to get down to be handcuffed, and when Plaintiff did not comply, took him to the ground and restrained him. Id. It is undisputed that Plaintiff sustained serious injuries to his mouth and teeth during the incident, though the parties diverge on the cause of his injuries. ECF No. 123 at 2. Plaintiff maintains that while Defendants were subduing him, they struck him in the face with something like a large metal flashlight, damaging his teeth. ECF No. 95 at 2. Defendants, for their part, assert that Plaintiff stumbled while running up the stairs and struck his face, thereby causing his injuries. Id.

After being taken into custody, Plaintiff was transferred to Southern State Correctional Facility. Ex. 7 to Pl. Brief, ECF No. 112-2 at 68. Upon his arrival, he was examined by a nurse, who noted Plaintiff's top left lateral tooth was missing, his two front top teeth and his bottom left lateral tooth were chipped diagonally, and his two center bottom teeth were loose. Id. at 61. He was subsequently seen on August 24, 2015, by Dr. Jennifer Hobbs, a dentist, who took six x-rays, but noted the missing tooth and damage to Plaintiff's top teeth only. Id. at 58. Plaintiff was then transferred to South Woods State Prison, where he sought follow-up care on September 8, 2015, regarding his missing tooth. Id. at 57. Treatment notes from that visit indicate that the treating dentist took another x-ray of Plaintiff's teeth and observed additional damage to one of Plaintiff's bottom teeth. Id. Plaintiff was then transferred to Northern State Prison, where he was treated by Dr. Eugene Vane on September 24, 2015. Id. at 54-55. Dr. Vane likewise noted damage to Plaintiff's top and bottom teeth, and took four additional x-rays that indicated potential nerve damage. Id. at 55, 128. Plaintiff was transferred three more times before his release in October 2019, receiving dental care in each facility, and ultimately losing five more teeth between 2015 and 2018. Id. at 43-54.

Shortly after the incident, Defendants referred the matter to the New Jersey Department of Corrections ("DOC") Special Investigations Division ("SID") for investigation as an assault on staff members. ECF No. 93 at 109:4-11. As part of the investigation, the investigator conducted a recorded interview with Plaintiff, where Plaintiff stated his version of events and requested his medical and dental records. SID Report, Plaintiff's Ex. 2 at 2. After the interview, the investigator looked into Plaintiff's allegations of excessive force. ECF No. 93 at 121:19-122:2. In addition to speaking with other corrections officers and another inmate, the investigator also consulted Dr. Hobbs regarding her observations of Plaintiff's injuries. SID Report, Plaintiff's Ex. 2 at 2. According to the investigator's report, Dr. Hobbs's examination revealed bruising on Plaintiff's mouth, but no jaw fractures. Id. at 2-3. Dr. Hobbs also compared the August 24, 2015 x-rays she took to Plaintiff's 2010 intake x-rays, which were taken when Plaintiff first arrived in custody. Id. at 2. Dr. Hobbs reported to the investigator that the 2010 x-rays indicated that Plaintiff's top front teeth were already fractured at the time of intake. Id. Thus, apart from a missing tooth, the August 24 x-rays showed no new damage to Plaintiff's teeth. Id. at 3. When asked to opine whether the missing tooth was the result of existing gum disease or the result of assault, Dr. Hobbs answered that existing gum disease could have contributed to the loss of the tooth, stating that she would have expected more swelling and hard tissue damage if the loss was caused by trauma. Id. at 5. The investigator ultimately concluded that, based on Dr. Hobbs's findings and the fact that all officers denied either using or witnessing the use of excessive force, Plaintiff's claims against Defendants could not be substantiated. Id.

Plaintiff filed his complaint in this matter on June 28, 2017, while he was still in custody. ECF No. 1. On May 27, 2018, Plaintiff served a document request for "[a]ny and all medical records for Plaintiff Milton Neal which were generated by providers of medical services to Plaintiff

by or through the [DOC] during the course of Plaintiff's incarceration, from on or about August 5, 2010 to the present." ECF No. 112-2 at 99. When Plaintiff's x-rays were not included with Defendants' initial response, Plaintiff served a separate, specific request for the x-rays on August 7, 2019. ECF No. 112-2 at 101. However, Defendants were ultimately unable to locate or produce the x-rays, leading then-Magistrate Judge Williams to direct Defendants to produce a certification detailing their search efforts. ECF No. 112-2 at 110; ECF No. 37. On March 9, 2020, Defendants produced a certification by Dr. Louis Colella, the Director of Dental Services for the DOC's Health Services Unit, which stated the DOC's general policies regarding the storage of inmate medical records as well as the efforts undertaken to locate Plaintiff's records. Colella Cert. ¶ 1, ECF No. 123-2 at 2.

Including the x-rays taken by Dr. Hobbs and Dr. Vane in 2015, DOC dental providers took at least twenty-three x-rays of Plaintiff's teeth between August 24, 2015, and May 15, 2018. ECF No. 112-1 at 5. According to DOC policy, an inmate's medical records are stored in both electronic and paper formats, with the relevant difference being that the paper record, or "hard copy chart," contains documents, such as x-rays, that cannot be uploaded into the electronic record. Kaldany Cert. ¶ 3, ECF No. 123-2 at 18. An inmate's hard copy chart is maintained by University Correctional Health Care[1] ("UCHC/Rutgers") staff members at the prison facility where the inmate is housed. Colella Cert. ¶ 4, ECF No. 123-2 at 3. Upon the inmate's release, the hard copy chart is sent to the DOC's Central Reception and Assignment Facility ("CRAF") for storage. Id. ¶ 8, ECF No. 123-2 at 3. In his certification, Dr. Colella explained that, after receiving the request for Plaintiff's x-rays in 2019, he contacted the Medical Records Director of UCHC/Rutgers to locate

---

[1] University Correctional Health Care is an affiliate of Rutgers University, with whom the DOC contracts for inmate medical services. Kaldany Cert. ¶ 3, ECF No. 123-2 at 18.

Plaintiff's hard copy chart. <u>Colella Cert.</u> ¶ 2, ECF No. 123-2 at 2. According to the certification, the Medical Records Director advised Dr. Colella that she instructed her staff to search each facility at which Plaintiff was housed, and, when that was unsuccessful, she contacted archives staff from CRAF to asked them to search their records. <u>Id.</u> ¶¶ 5-7. Dr. Colella certified that the Medical Records Director undertook this process on two separate occasions and were unable to locate Plaintiff's hard copy chart, leading him to speculate that they "may have been misfiled." <u>Id.</u> ¶¶ 10-12.

After receiving the Colella certification, Plaintiff continued to pursue the production of Plaintiff's x-rays by executing HIPAA waivers for third parties identified by Defendants' counsel as potential custodians of the x-rays, as well as by serving a subpoena directed to Dr. Colella in his official capacity. ECF No. 112-2 at 103-05. These efforts were unsuccessful, and Plaintiff's x-rays have never been produced. Plaintiff now seeks a jury instruction based on the alleged spoliation of evidence, alleging that Defendants have intentionally withheld Plaintiff's x-rays to deprive him of "the most probative, indisputable evidence in this case." ECF No. 112-1 at 12.

## II.   <u>Discussion</u>

As a general rule, spoliation includes both "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." <u>Victor v. Lawler</u>, Civ. No. 3:08-CV-1374, 2012 WL 1642603, at *6 (M.D. Pa. May 10, 2012) (quoting <u>Fortune v. Bitner</u>, No. Civ. 3:CV-01-0111, 2006 WL 839346, at *1 (M.D. Pa. Mar. 29, 2006)), <u>aff'd</u> 520 F. App'x 103 (3d Cir. 2013). The Court's authority to impose sanctions for spoliation stems from both the Federal Rules of Civil Procedure and the Court's inherent authority to sanction litigants for misconduct. <u>MOSAID Techs. Inc. v. Samsung Elecs. Co.</u>, 348 F. Supp. 2d 332, 335 (D.N.J. 2004) (citing <u>Scott v. IBM Corp.</u>, 196 F.R.D. 233, 247

(D.N.J. 2000)); Chambers v. NASCO, Inc., 501 U.S. 32, 44 (1991) (noting courts' inherent power to impose sanctions for misconduct before the court). The decision to impose sanctions is a matter committed the Court's sound discretion. Bozic v. City of Washington, 912 F. Supp. 2d 257, 266 (W.D. Pa. 2012).

Where, as here, the allegedly spoliated evidence is non-electronic, the Court applies the three-part test set forth in Bull v. United Parcel Service, Inc., 665 F.3d 68, 73 (3d Cir. 2012). Under that rule, "[s]poliation occurs where: the evidence was in the party's control; the evidence is relevant to the claims or defenses in the case; there has been actual suppression or withholding of evidence; and, the duty to preserve the evidence was reasonably foreseeable to the party." Id. These are elements, not factors. Masterank Wax, Inc. v. RFC Container, LLC, Civ. No. 19-12245, 2022 WL 19927891, at *4 (D.N.J. Aug. 30, 2022). Accordingly, the Court must find each part of the test satisfied before it can consider whether and what sanctions are appropriate. See Bull, 665 F.3d at 73 n.5 (emphasizing distinction between sanctions and spoliations analyses); Bozic, 912 F. Supp. 2d at 266 (noting Bull articulated two-step analysis for determining spoliation sanctions). Plaintiff, as the party seeking a spoliation sanction, has the burden of establishing each element. McCann v. Kennedy Univ. Hosp., Inc., Civ. No. 12-1535, 2014 WL 282693, at *4 (D.N.J. Jan. 24, 2014) (quoting Kachigian v. Berkshire Life Ins. Co. of Am., Civ. No. 09-6217, 2013 WL 1338288, at *2 (D.N.J. Apr. 1, 2013)).

### A.  Relevance

There can be no real question as to the relevance of Plaintiff's x-rays to this litigation. Plaintiff and Defendants have presented competing narratives of the incident leading to Plaintiff's injuries, meaning that credibility determinations will be central to the outcome of this case. Plaintiff's x-rays were singular in their objective depiction of the short- and long-term damage to

Plaintiff's teeth following the incident. Experts for both parties have indicated that the loss of the x-rays has hindered their ability to determine the cause of Plaintiff's injuries and potential remedies, further underscoring the importance of the x-rays to both liability and damages. ECF No. 112-2 at 63; id. at 144. Therefore, this element of the spoliation test is easily met.

### B.      Control

Defendants first argue that Plaintiff has failed to establish the element of control because "Plaintiff cannot link any subsequent disappearance of the x-rays to the Defendants." ECF No. 123 at 8. In support of this argument, Defendants have supplied a certification from the Director of the Health Services Unit of the New Jersey Department of Corrections, in which he avers that "front-line corrections officers do not, and cannot, gain access to [inmate medical records]." Kaldany Cert. ¶ 5, ECF No. 123-2 at 18. Based on this evidence, Defendants contend that "neither Defendant would have had any access to Plaintiff's medical chart[s], to attempt to hide or otherwise manipulate them," and "could not have had any way of knowing whether they contained hurtful or exculpatory evidence." ECF No. 123 at 6. Instead, Defendants assert that the missing x-rays were "in the exclusive control of the Rutgers' medical/dental staff, at least until Plaintiff was released." Id. at 8. Defendants argue that, under these circumstances, "[t]o permit an adverse inference to be read to the jury would hold them responsible for something that was completely outside of their control, and would cause both Defendants undue prejudice." Id. at 9.

Defendants' lack of personal access to the x-rays is not dispositive of the issue of their control over them. See First Senior Fin. Grp. LLC v. Watchdog, Civ. No. 12-cv-1247, 2014 WL 1327584, at *5 (E.D. Pa. Apr. 3, 2014) ("Lack of physical possession does not necessarily negate a party's control over evidence."). In the spoliation context, as with discovery of documents generally, "control" refers to the legal right or ability to obtain documents or evidence from another

7

source on demand. Haskins v. First Am. Title Ins. Co., Civ. No. 10-5044, 2012 WL 5183908, at *1 (D.N.J. Oct. 18, 2012) (applying Rule 34 concept of control to spoliation context); Indem. Ins. Co. of N. Am. v. Electrolux Home Prods., Inc., Civ. No. 10-4113, 2011 WL 6099362, at *8 (E.D. Pa. Dec. 7, 2011) (finding evidence was in plaintiff's control despite being located on property controlled by a non-party entity because plaintiff's experts had the authority and ability to remove relevant evidence from the premises). In that regard, a party's control over evidence for spoliation purposes does not necessarily depend on their physical access to that material; instead, control may exist so long as the party is responsible for turning over the material to the court, and either had the means to do directly or petition the court for assistance. See First Senior Fin. Grp., 2014 WL 1327584, at *6.

Here, Defendants may not have had personal access to Plaintiff's medical records, but the Court nevertheless finds that they had "control" over them as that term is understood by the Third Circuit. See Prall v. Bocchini, Civ. No. 10-1228, 2015 WL 13698719, at *2 (D.N.J. Mar. 3, 2015) (citing Mercy Cath. Med. Ctr. v. Thompson, 380 F.3d 142, 160 (3d Cir. 2004)) (imputing prison's control of spoliated video surveillance footage to individual corrections officer defendants based on defendants' ability to obtain documents in discovery); cf. Love v. N.J. Dep't of Corr., Civ. No. 15-4404, 2017 WL 3477864, at *6 (D.N.J. Aug. 11, 2017) (finding corrections officers in "control" of prison records for discovery purposes based on the state's "significant stake in the outcome of this suit," officers' representation by state Attorney General's office, and their attorney's "practical ability to obtain documents from the Department of Corrections"). The Court notes that, as in Prall, Defendants in this case were attempting to comply with Plaintiff's request for the production of the allegedly spoliated evidence—here, Plaintiff's x-rays—when it was discovered that the evidence was missing. Moreover, although Defendants have provided certifications explaining that

"front-line corrections officers do not, and cannot, gain access to [an inmate's electronic medical records or hard copy chart]," Kaldany Cert. ¶ 5, ECF No. 123-2 at 18, the Court does not find that this is sufficient to establish lack of control for the purposes of this motion. Defendants produced an otherwise complete copy of Plaintiff's medical record in discovery, and had the x-rays been found, clearly would have been able to produce them as well. See Colella Cert. ¶ 2, ECF No. 123-2 at 2. Therefore, the Court concludes that, for the purposes of this motion, Defendants had control over Plaintiff's x-rays.

### C.     Duty to preserve

The duty to preserve evidence arises when the party in possession of the evidence "knows that litigation by the party seeking the evidence is pending or probable and the party in possession of the evidence can foresee the harm or prejudice that would be caused to the party seeking the evidence if the evidence were to be discarded." Kounelis v. Sherrer, 529 F. Supp. 2d 503, 518 (D.N.J. 2008). Thus, "[t]he duty to preserve evidence begins when litigation is 'pending or reasonably foreseeable.'" Dunn v. Mercedes Benz of Fort Wash., Inc., Civ. No. 10-1662, 2012 WL 424984, at *5 (E.D. Pa. Feb. 10, 2012) (quoting Micron Tech., Inc. v. Rambus Inc., 645 F.3d 1311, 1320 (Fed. Cir. 2011)). Reasonable foreseeability is "'a flexible fact-specific standard that allows a district court to exercise the discretion necessary to confront the myriad [of] factual situations inherent in the spoliation inquiry.'" McCann, 2014 WL 282693, at *5 (quoting Bull, 665 F.3d at 78). While "[t]here is no single bright line that definitively marks when litigation reasonably should be anticipated," the type and seriousness of the alleged injury, the tendency of certain kinds of incidents to lead to litigation, and whether the defendant initiated an investigation into the incident are all relevant to the determination. Bistrian v. Levi, 448 F. Supp. 3d 454, 468 (E.D. Pa. 2020).

Defendants contend that their lack of personal control over the x-rays necessarily forecloses a finding that they had a duty to preserve them. ECF No. 123 at 13. On the contrary, courts in this Circuit have long held that "[t]he fact that a party does not have complete control of evidence does not relieve her duty to preserve the evidence, or at least notify opposing counsel of any risk of destruction." First Senior Fin. Grp., 2014 WL 1327584, at *9. Accordingly, courts in this district have, under certain circumstances, concluded that the duty to preserve evidence can be imputed to individual corrections officers, even if the allegedly spoliated evidence was formally in the custody of the facility. See Kounelis, 529 F. Supp. 2d at 518-19; Prall v. Bocchini, Civ. No. 10-1228, 2014 WL 12803522, at *3 (D.N.J. June 12, 2014), modified on other grounds, 2015 WL 13698719 (D.N.J. Mar. 3, 2015). This approach is consistent with that of other courts, which have recognized that because of the "unique relationship between [state correctional facilities] and its correctional officers in the context of spoliated evidence," Stanbro v. Westchester Cnty. Health Care Corp., 19 Civ. 10857/20 Civ. 1591, 2021 WL 3863396, at *6 (S.D.N.Y. Aug. 27, 2021), "a state correctional department's spoliation may under certain circumstances be imputed to individual defendants to avoid unfair prejudice to inmate litigants," Baltas v. Fitzgerald, Case No. 3:21cv587, 2023 WL 5207316, at *4 (D. Conn. Aug. 14, 2023). As the court observed in Stanbro, a per se rule to the contrary "would lead to the absurd result that a state-run correctional facility could wrongly destroy any piece of evidence in its control with near-zero risk of consequence in prisoner suits," Stanbro, 2021 WL 3863396, at * 6 (quoting Johns v. Gwinn, 503 F. Supp. 3d 452, 464 (W.D. Va. 2020)), as the DOC cannot be sued for damages under Section 1983, nor can it be held vicariously liable for the torts of its employees, Terry v. N.J. Dep't of Corr., Civ. No. 06-3030, 2006 WL 3780761, at *3 (D.N.J. Dec. 21, 2006) (noting that New Jersey Department of Corrections is not a "person" within the meaning of § 1983). Here, although Plaintiff has sued

Defendants in their individual capacities, Defendants are state employees being represented by the New Jersey Attorney General's Office and will be indemnified by the state in this litigation. See Love, 2017 WL 3477864, at *6 (citing N.J.S.A. 59:10-1). Therefore, the Court finds that, to the extent the DOC had a duty to preserve evidence, that duty may be imputed to Defendants.

Plaintiff argues that the duty to preserve evidence arose as early as August 23, 2015, the day before the first set of x-rays was taken, because by that point, Plaintiff had submitted a prison inquiry form requesting his medical records and given an interview with prison investigators detailing his claims, and an attorney affiliated with the American Friends Service Committee ("AFSC") had written a "Legal Correspondence" to DOC Commissioner Gary Lanigan on Plaintiff's behalf requesting that the prison preserve evidence of the assault. ECF No. 112-1 at 13; see ECF No. 112-2 at 94. The Court need not decide exactly when the duty to preserve was triggered, because at the very latest, it arose on August 16, 2017, when Defendants were both served with Plaintiff's complaint. Bozic, 912 F. Supp. 2d at 267. Perhaps unsurprisingly, the parties have been unable to pinpoint the date that Plaintiff's x-rays were lost. However, the Court has several reasons to conclude that they were lost after this August 16, 2017 trigger date. First, seven of the twenty-three known x-rays were created after Defendants were served in this matter, and thus were necessarily lost after that date. ECF No. 112-2 at 43-46. As for the rest, Dr. Vane treated Plaintiff from September 2015 to May 2016, and then again from April 2018 until July 2018. Vane Dep., ECF 112-2 at 126-37. Dr. Vane testified that he typically reviewed an inmate's prior x-rays on the day of their appointment and he could not recall an instance where the records department was unable to provide him with Plaintiff's x-rays during this period of treatment; according to his testimony, he was actually unaware they were missing until defense counsel raised the issue at the deposition. Id. at 138. This suggests that the earlier x-rays were similarly lost after

2018. Therefore, the Court finds that the x-rays were lost after the DOC was aware of their potential use in litigation.

### D.   Actual Suppression or Withholding

To establish actionable spoliation, the moving party must demonstrate "that there has been an actual suppression or withholding of the evidence." Brewer v. Quaker State Oil Refin. Corp., 72 F.3d 326, 334 (3d Cir. 1995). In Bull, the Third Circuit explained that "a finding of bad faith is pivotal to a spoliation determination," because "[w]ithholding requires intent." 665 F.3d at 79. Bull further makes clear that "destruction that occurs as a result of inadvertence, routine practice, or accident is not spoliation at all." Bozic, 912 F. Supp. 2d at 269; see Bull, 665 F.3d at 79. Consequently, spoliation does not exist where "circumstances indicate that the document or article in question has been lost or accidentally destroyed, or where the failure to produce it is otherwise properly accounted for." United States v. Nelson, 481 F. App'x 40, 42 (3d Cir. 2012) (quoting Brewer, 72 F.3d at 334). In applying these principles, courts have declined to find spoliation "where the party's conduct was no worse than negligent, or where the evidence was lost in the normal course of daily business or other similar activity." Bozic, 912 F. Supp. 2d at 270 (collecting cases); compare Heck v. Mem'l Health Sys., No. 1:10-cv-1675, 2012 WL 3597175, at *2-3 (M.D. Pa. Aug. 20, 2012) (declining to find spoliation where loss of evidence was accidental), with Capogrosso v. 30 River Ct. E. Urb. Renewal Co., 482 F. App'x 677, 682 (3d Cir. 2012) (affirming spoliation sanction where plaintiff disposed of allegedly moldy property despite knowing defendant insurance company sought to inspect it).

Plaintiff argues that bad faith should be inferred from the totality of circumstances in this case. Plaintiff points out that since first requesting the x-rays in 2019, counsel for Defendants has made varying representations about the x-rays' location and which entity maintains custody over

them, including that: (1) the x-rays were maintained by a third-party vendor, Mobile-X, who was not mentioned in Plaintiff's medical records; and that (2) the x-rays were likely stored in a Rutgers facility, rather than by the DOC. ECF No. 112-1 at 14. These representations are directly contradicted by Dr. Colella's March 9, 2020 certification, which stated that the records containing Plaintiff's x-rays would have been stored in the DOC's facilities under the maintenance of UCHC/Rutgers staff, and upon Plaintiff's release, at the DOC's CRAF facility. Colella Cert. ¶¶ 4, 8, ECF No. 123-2 at 3. Plaintiff urges the Court to consider counsel's statements alongside "several indications in the record that DOC employees have repeatedly hampered [Plaintiff's] efforts to seek accountability for his injuries."[2] ECF No. 112-1 at 15. In addition to his prior testimony, Plaintiff has provided a sworn certification by Jamal Sanders (the "Sanders certification"), an inmate housed with Plaintiff who corroborated Defendants' account in 2015, but has since recanted his statement and now certifies that "DOC employees coerced and threatened him" into making his 2015 statement. Ex. 6 to Pl. Brief, ECF No. 112-2 at 39-41. Plaintiff further argues that the DOC's failure to locate Plaintiff's x-rays stands in stark contrast to testimony in the record regarding "the cohesiveness and general reliability of the medical file storage procedures in the DOC." ECF No. 112-1 at 15. Taken together, Plaintiff contends that "[t]he repeated, corroborated instances of misconduct by DOC employees in responding to [Plaintiff's] allegations, in conjunction with the lack of plausible explanation for the x-rays' disappearance from a reliable records department, indicate that this failure to produce was not simply accidental." Id. at 16.

---

[2] Plaintiff gave testimony to this effect in a February 3, 2023 evidentiary hearing held before Judge Williams on the issue of whether Plaintiff had sufficiently exhausted his administrative remedies. ECF No. 93. Judge Williams credited this testimony, ultimately concluding that "Plaintiff was not provided with the necessary forms, forms submitted were either not received or were not properly returned to Plaintiff, and Plaintiff was in any event subjected to a number of transfers in short order during the relevant period that further hindered his ability to engage in the grievance process." ECF No. 95 at 10.

As noted above, intent is the cornerstone of the spoliation analysis. "Because courts are unable to 'examine [a party's] head' to 'confirm [whether they] acted in bad faith,' courts look to circumstantial evidence to determine intent." Bistrian, 448 F. Supp. 3d at 475 (quoting DVComm, LLC v. Hotwire Commc'ns, LLC, Civ. No. 14-5543, 2016 WL 6246824, at *8 (E.D. Pa. Feb. 3, 2016)). In that regard, to the extent Defendants argue that the absence of direct evidence of bad faith concludes the issue, the Court disagrees. ECF No. 123 at 11-12. On the contrary, courts may infer bad faith from facts such as timing and method of the loss of evidence, whether the lost information was harmful to the party in control, as well as whether the loss of evidence conflicted with or violated the controlling party's internal retention policies. Bistrian, 448 F. Supp. 3d at 475-76. Additionally, as Plaintiff correctly points out, the Court may consider shifting representations offered by the party or their counsel to explain the non-production of evidence as evidence of bad faith. See First Senior Fin. Grp., 2014 WL 1327584, at *8 ("Additionally, a party's obfuscation or lying can show that she is acting in bad faith." (citing Bull, 665 F.3d at 77)).

With respect to the representations by Defendants' counsel, the Court notes that misrepresentations and other misconduct by a party's attorney can be a factor in determining whether the party acted in bad faith. For example, in Sabinsa Corp. v. Herbakraft, Inc., Civ. No. 14-4738, 2018 WL 11510663, at *12 (D.N.J. Dec. 17, 2018), a patent infringement suit, the court found the Bull test satisfied when a party failed to produce usable product samples for testing. Relevant here, the court based its finding of bad faith on the many misrepresentations made by the party regarding the samples' status and the completeness of its discovery responses. See id. at 10 ("The misrepresentations . . . are numerous, significant, and alone sufficient evidence of bad faith."). In addition to these statements, the court also considered it "important to note" that the party's counsel, by its own admission, knew that the party's certifications were incorrect but

14

nevertheless advanced those positions to the court. Id. at *10 n.13. Similarly, in Fairview Ritz

Corp. v. Borough of Fairview, Civ. No. 09-0875, 2013 WL 163286, at *5 (D.N.J. Jan. 15, 2013),

modified on other grounds, 2013 WL 5435060 (D.N.J. Sept. 27, 2013), the court found spoliation

occurred when the party's attorney personally removed documents from a set of files that were

under subpoena, then subsequently lost the documents. There, the court explained that the Bull test

was satisfied because "bad faith" under Bull referred not to nefarious motive, but rather the intent

to deprive the other party of evidence. Id. The court found that the party and its attorney had

evinced such intent based on counsel's shifting descriptions of the documents' contents and

location, as well as inconsistent representations regarding the plaintiff's relationship to the third-

party that counsel sent the documents to before they were lost. Id.

       The Court has reviewed the attached email exchanges between counsel regarding the

production of the x-rays, and while the Court finds that defense counsel misstated the location of

the x-rays, it does not find that counsel did so with the intent to mislead Plaintiff. Upon receiving

Plaintiff's specific request for the x-rays, defense counsel responded that he had no x-rays, stated

that "[g]enerally, the department farms out such imaging to outside entities such as Mobile-X,"

and offered to "see what [he could] do on [his] end" if Plaintiff's counsel forwarded specific

records mentioning x-rays to him. Ex. 15 to Pl. Brief, ECF No. 112-2 at 113. When Plaintiff's

counsel pointed out that Plaintiff's medical records suggested that the x-rays were taken within the

facilities in which Plaintiff was housed, counsel advised that he had made a corresponding request

to the DOC. Id. at 112. When the DOC and Rutgers could not locate the records, defense counsel

advised that he had inquired with the third-party vendor in an attempt to locate Plaintiff's x-rays.

Id. at 107. Counsel apparently learned from the Colella certification that "the records are

maintained by UCHC/Rutgers," and it was UCHC/Rutgers who could not locate the records rather

than the DOC. Id. at 106. Read in their context, the Court finds that counsel's misstatements were genuine mistakes of fact, rather than intentional misrepresentations designed to avoid producing the x-rays. Therefore, the Court does not find counsel's statements to be evidence of bad faith.

The Court finds that the conduct of the DOC's employees presents a closer question. In determining whether a party has displayed bad faith, "the Court must place [the party's] behavior on the spectrum between misrepresentation, bad faith, and intentional or knowing behavior on the one hand; and inadvertence, accidental loss, and properly-explained withholding of evidence on the other." First Senior Fin. Grp., 2014 WL 1327584, at *8 (citing Bull, 665 F.3d at 77, 79). On one hand, the importance of Plaintiff's x-rays and medical record to his claims was clearly appreciated from an early stage. The investigator's report documents several conversations with Dr. Hobbs regarding her observations, and it indicates that the investigator reviewed Plaintiff's pre- and post-incident medical records in drawing his conclusions. SID Report, Plaintiff's Ex. 2 at 2. Moreover, as noted above, Plaintiff filed this lawsuit while his treatment was ongoing, unequivocally putting Defendants on notice of the need to preserve Plaintiff's medical record. ECF No. 1. Given that background, the Court is deeply troubled by the inaction displayed by the DOC and Defendants in this case, particularly when viewed alongside the evidence in the record of staff interference with Plaintiff's administrative remedies.

That being said, the Colella certification and the correspondence between counsel both suggest that the DOC has lost Plaintiff's entire hard copy chart, not just his x-rays. Colella Cert. ¶¶ 3-7, ECF No. 123-2 at 3; Ex. 15 to Pl. Brief, ECF No. 112-2 at 110. The Court recognizes that Defendants have failed to offer a satisfactory explanation as to what happened to the records; indeed, the only explanation offered is Dr. Colella's vague speculation that they "may have been misfiled." Colella Cert. ¶ 12, ECF No. 123-2 at 4. However, the Court finds the offered explanation

16

plausible in light of the testimony that paper medical files physically follow an inmate as they are transferred to different facilities, and then to a central holding facility upon the inmate's release. See Vane Dep., ECF No. 112-2 at 127; Colella Cert. ¶¶ 4-8, ECF No. 123-2 at 3. Plaintiff was transferred to two different facilities in 2018 and was released in 2019, meaning the records would have been moved to at least three different facilities since his complaint was filed. Ex. 9 to Pl. Brief, ECF No. 112-2 at 69-70. In the Court's view, the failure to offer a detailed explanation as to how the records were lost more likely stems from the inability to identify when the records were lost, rather than any intent to misdirect Plaintiff or the Court as to their whereabouts. It appears that Defendants were able to produce Plaintiff's 2010 intake x-ray, but not the remaining x-rays, because the intake x-ray was kept with the DOC's investigative file. Gardner Cert. ¶ 9, ECF No. 123-2 at 14-15. In that regard, "negligence remains a reasonable explanation for everything that happened." Bull, 665 F.3d at 80. Under Bull, "[s]poliation of evidence requires 'bad faith,' not mere negligence." Orologio of Short Hills Inc. v. The Swatch Grp. (U.S.) Inc., 653 F. App'x 134, 145 (3d Cir. 2016) (citing Bull, 665 F.3d at 79).

Altogether, and weighing all of the facts presented in the current record, the Court finds that Plaintiff has not established a "course of conduct [that] rises above mere negligence and inadvertence to effectuating actual suppression of evidence." First Senior Fin. Grp., 2014 WL 1327584, at *9. This does not appear to be a case of selective preservation, i.e., where helpful or neutral evidence is preserved while harmful evidence is withheld or destroyed. See Bistrian, 448 F. Supp. 3d at 475-76. On this record, it is not clear that Plaintiff's x-rays would have been harmful to Defendants' case at all. Setting aside Plaintiff's own assertions, the record lacks any indication that the x-rays would have necessarily contradicted Defendants' narrative, undermined their defenses to this action, or otherwise would have been favorable to Plaintiff. See Brown v. Certain

Underwriters at Lloyds, Civ. No. 16-cv-02737, 2017 WL 2536419, at *3-4 (E.D. Pa. June 12, 2017) (finding bad faith in part because record suggested that party's lost phone likely contained communications that would defeat party's claims). Nor can the Court find support for a conclusion that Defendants deliberately withheld Plaintiff's x-rays to gain a litigation advantage. At least some, though not all, of the x-rays were described in treatment notes that were produced in discovery, which runs counter to the inference that Defendants were deliberately hiding the x-rays' contents. Ex. 7 to Pl. Brief, ECF No. 112-2 at 43-45, 52-57 (describing x-rays); see Harris v. Jacobs, Civ. No. 11-4685, 2012 WL 4109052, at *14 (E.D. Pa. Sept. 19, 2012) (finding no bad faith where "[a]ny copies of the [lost] file's contents which could be recovered elsewhere . . . were provided."); Kuhar v. Petzl Co., Civ. No. 16-0395, 2018 WL 6363747, at *7 (D.N.J. Nov. 16, 2018) (finding no bad faith in dispute over cleaning of rusty bolt where plaintiff permitted defendant to inspect and photograph bolt in original condition and preserved half of the bolt in its uncleaned state). Moreover, the record shows that Defendants have been generally cooperative, albeit at times disorganized, in attempting to locate Plaintiff's paper record, and have otherwise produced all other documents in Plaintiff's medical record. This cooperation further undermines an inference of bad faith withholding. See Brown, 2017 WL 2536419, at *4 (finding bad faith in part due to party's failure to demonstrate good faith effort to locate lost phone).

"In order to find [a party] acted in bad faith, the Court must find that [the party] 'intended to impair the ability of [the opposing party] to defend [themselves]." Kuhar, 2018 WL 6363747, at *7 (last alteration in original) (quoting Schmid v. Milwaukee Elec. Tool Corp., 13 F.3d 76, 80 (3d Cir. 1994)). Considering the record presented, the Court is unable to conclude that the loss of Plaintiff's x-rays was motivated by the pursuit of a litigation advantage. While the failure to preserve Plaintiff's medical records was, at the very least, negligent, Plaintiff has not adduced any

evidence to suggest that any individual or entity took affirmative steps that were calculated to result in the loss of Plaintiff's x-rays. See Dunn, 2012 WL 424984, at *6 (declining to find bad faith absent evidence that defendants targeted allegedly spoliated data for deletion); First Senior Fin. Grp., 2014 WL 1327584, at *9 (finding bad faith based on lengthy resistance to production, deliberate miscommunications with counsel, and reckless failure to secure evidence prior to leaving the state); see also Prall, 2014 WL 12803522, at *4 (finding bad faith where party relied on security footage to support its position in earlier proceedings, but then allowed it to be automatically overwritten by prison's retention policy before it could be produced in discovery). The Court is cognizant of the credible evidence in the record that DOC staff have previously interfered with Plaintiff's attempts to pursue remedies for his excessive force claims. However, Plaintiff's x-rays were partially described elsewhere in Defendants' document production, their loss is susceptible to an innocent explanation, and their ultimate evidentiary value to the claims or defense is indeterminate. Moreover, Plaintiff will have the opportunity to examine witnesses at trial and present evidence as to the missing x-rays if he so chooses, and as permitted by the Rules of Evidence and the trial judge. See Dunn, 2012 WL 424984, at *6. But, absent evidence that Defendants or the DOC deliberately concealed evidence in order to gain a litigation advantage, the Court cannot find that actionable spoliation occurred, and sanctions are not warranted.

IT IS, therefore, on this **19ᵗʰ day** of **July 2024,**

ORDERED that Plaintiff's motion for spoliation sanctions is **DENIED.**


s/ Matthew J. Skahill
MATTHEW J. SKAHILL
United States Magistrate Judge


cc:    Hon. Karen M. Williams
       United States District Judge

19